May it please the Court, my name is Tom Davies and I represent the Plaintiff Appellant Billy Tedder. The bottom line of this case is simple. There is ample evidence in the record from which a rational trier of fact could easily conclude that the defendant was acting maliciously and sadistically when he attacked Mr. Tedder with a host of pepper spray in the face. The defendant was repeatedly taunting Mr. Tedder with a racial slur and moreover under the circumstances there was just no need whatsoever to use any kind of force on Mr. Tedder. He was an obviously sick man who was having trouble even standing up when he was pepper sprayed and was not offering any kind of resistance. He never disobeyed an order nor did he ever refuse to obey an order nor did he ever threaten anyone. Your position that he is obviously sick is based on what evidence? One of the affidavits in the record of one of the other prisoners states that all those present could easily tell that Tedder was in distress. Tedder appeared to be sickly, he was moving slowly and was in distress. Moreover he was walking with a cane. He himself told the defendant that he was too weak to make it back to the dorm and his illness was well documented in that he had had it for many years and the prison medical department had issued him a written pass to sit or lie down whenever he felt unable to stand which happened two to three times per day. So this was a well documented regular thing. For that to be relevant it would have to have been known by the defendant when you refer to his medical condition. Firstly it should have been obvious to the defendant just from looking at the situation. All those present could easily tell that Tedder was in distress regardless of what the guard knew beforehand and moreover the guard in his affidavit claimed to know who Mr. Tedder was and to be familiar with him with his supposedly long and violent disciplinary record which actually was not long or violent but the point is that the defendant claimed to know who this prisoner was. He wasn't just someone he'd never met before. On many prior occasions he had seen Mr. Tedder go to the pill line to get his medication that he needed to take three times a day for this severe disorder that he'd had for a long time. So taking the record in the light most favorable to the plaintiff there is plenty of evidence that the defendant knew that Mr. Tedder was actually a very sick man who posed no threat and moreover that he was physically unable to carry out the order to go back to his unit. Mr. Tedder was not somehow choosing to disobey that order he just simply couldn't carry it out and I submit that that's an important distinction because when an inmate chooses not to obey an order they're offering some kind of resistance to authority. There's maybe a reasonable supposition that this might lead to some further disorder or danger of some kind but when a person physically can't do something they just physically can't do something. They're not doing anything wrong. They're not offering any kind of resistance. They're not doing anything that is somehow going to lead to a fight or a riot or anything like that. He just simply couldn't do it. That's all. He wasn't disobeying an order. Was that what this case comes down to with regard to this claim as to whether or not he was visibly sick as opposed to just disobeying an order? If I were representing a client who had disobeyed an order I would argue to you that merely disobeying an order there's no categorical rule that any disobedience to an order whatsoever automatically justifies use of force such as pepper spray to the face that you still have to look at whether there's actually any type of danger in the situation whether there's any actual need to use this type of force in order to get the prisoner to comply with the order. But I don't need . . . So what a correctional officer is supposed to do when a prisoner disobeys an order particularly right in front of all these other inmates who are standing in line is to debate with him as to whether or not he really needs to do what he's been told to do? I wouldn't say there's any . . . Or force before mace is used? I certainly don't think there's any kind of duty to debate with a prisoner about obeying an order, no. If a prisoner had disobeyed an order which didn't happen in this case then . . . He told him to go back and he did. Yeah. He told him to go back to his unit and he did. He was unable to and I submit that there's a difference between disobeying and being unable to obey. That's what I'm asking. Is that what this case comes down to? It's whether or not he has enough evidence believed by a jury to show that he was in distress and was not intentionally disobeying an order? I wouldn't go so far as to say that's what this case comes down to but I do think it's a very important fact in my client's favor that there is . . . What else is in your favor that would support your claim? Also the fact that Mr. Tedder just posed no threat whatsoever. He was barely able to even stand up, let alone to . . . Tell us a little bit more about the circumstances here. You've got a prisoner who isn't he in line to get some medication or something? Yes. And he's legitimately so there and this medication is for what purpose? He had what's called in the record a seizure disorder. It was something he'd had for most of his life since he was a teenager. It caused him to regularly suffer grand mal and petit mal seizures and to make him unable to stand up. And he's clearly in line legitimately to receive this medicine and there's a prison guard. Now what is the relationship of this prison guard who's there? Is he there to monitor that line or is he there just in general? The record indicates the prison guard is standing at this gate. It's not entirely clear what he was doing in there except flirting with some other officers nearby. What was that? You said except to . . . Except flirting with some other officers nearby. Flirting with some other officers. What's the evidence of that? Flirting with the female officer there? Yes. One of the affidavits in the record describes Sergeant Johnson as doing that before this incident began. At any rate . . . It's a summary judgment so we take that to be true. So he's flirting with other officers in line. The prisoner is in line. He has this disorder. He's waiting for his medicine and then what . . . how does this come up, arise? Well he has to go through this gate to get his medicine and the defendant is at the gate and the defendant says, you ain't going through the gate. And Mr. Tedder attempts to explain in just a few words, politely, that he has the permission of a superior officer, Lieutenant Graham, to go through the gate, which he needs to do to get his urgently needed medication. And all he says is, I told him that Lieutenant Graham was calling him on the radio. Then Lieutenant Graham did call on the radio and said, quote, let Billy Tedder through. And after that, Mr. Tedder said, no, Lieutenant Graham said I could go through. The defendant continued to refuse to let him through the gate, to order him not to go through the gate. What did he say to him? What did the defendant say or what did Mr. Tedder say? What did the defendant say to him? He said, you ain't getting through the gate. A couple of times he used the word cracker. It was something to the effect of, no cracker, you ain't getting through this gate, the second or third time. He said a total of three times, you're not getting through the gate. Tell me about that term, cracker. What does he mean by that? Why is that being used in this context? I think a reasonable fact finder should infer that it's being used to insult and intimidate Mr. Tedder on account of his race, being a white person. It's a derogatory term sometimes used toward white people. And in this instance, it's this guard using it against this prisoner who then goes on to unnecessarily inflict pain on this prisoner. And I think the reasonable inference under those circumstances is it's being used. If you look it up in Wikipedia, that's exactly what it means. Yes. I haven't looked it up in Wikipedia, but I'm sure that's what you would find. I think it's a well-known derogatory racial term. So part of a determination is whether the force that ultimately was used, and there have been cases that say that if mace or pepper spray is used unnecessarily, that that is excessive force, is a question of whether the force that was used when it was in this case, those things have come up. It seems like the facts have been a little bit more egregious than what you're dealing with here. But what makes that force that ultimately was used against him excessive or unreasonable under the circumstances? What it has to be under the Supreme Court's holdings in Hudson and Wilkins is non-trivial and inflicted maliciously and sadistically. And it is inflicted maliciously and sadistically, a reasonable fact finder can infer, because of the total absence of any need for force in this circumstance, and additionally because of the fact that the defendant laughed and taunted him with this racial slur that betrayed his state of mind. Is there any indication that your client at any time threatened him or presented him with a situation in which he may have been in apprehension of some type of injury or threat from him? My client categorically denies that in his affidavit. The defendant initially didn't make any such allegation either in his initial two reports on the use of force. Subsequently in an affidavit prepared for this litigation, the defendant changed his story and added an allegation that my client supposedly raised his wooden cane in a threatening manner. But again, my client categorically denies that and this being summary judgment. He has a wooden cane? And what is the purpose of the cane? He had this illness which frequently made him feel dizzy and be unable to stand up. He was issued the cane to help him to cope with that. He had a written pass authorizing him to carry it at all times. How old was your client? He was, I want to say, 46 at the time of the incident. And he's standing in line waiting for his medication for this seizure with a wooden cane for support? Yes. I imagine you don't have that in prison unless you have some legitimate basis for doing so. Certainly not. And the affidavits in the light most favorable to your client indicate that he was not threatening at any time and this pepper spray was used against him. And what happened as a result of the pepper spray? As a result of the pepper spray, he fell down and had an asthma attack and struggled to and took him away to be cleaned up. And over the long term, the use of pepper spray exacerbated the symptoms of his asthma, made him have to use much more medication more frequently to control it, also damaged his senses of taste and smell, and made him be subsequently less active and more prone to seizures, according to one of the affidavits in the record. What do you seek in this case? Reversal of the district court's decision to grant summary judgment to the defendant. And damages would be? Damages is not a subject I've given a lot of thought to because I've just been the appellate advocate on this. You just want to try the case? Pretty much, yes. That happens when a lawyer is not interested in the damage because it's not a contingency fee case, is that right? I'm certainly not going to get any fee out of this. Okay, thank you, Mr. Davies. You've got some time reserved. Let's hear from Mr. Wilcox. Mr. Wilcox, this case is before us on an appeal from the district court's grant of summary judgment, is that correct? Yes, sir. What was the district court supposed to do in considering the evidence? Well, Your Honor, the district court considers the evidence in the light most favorable to the plaintiff. Is that established by the record? Yes, sir. The plaintiff had two affidavits. The plaintiff had the permission from Lieutenant Graham to go through the gate. The plaintiff couldn't make it because of his physical condition when not getting his medication. He stated that he was trying to get back to his unit. Was he not compliant at that time? No, sir. Why not? He was asked twice before he came up with that excuse to return to leave the pill line. That is undisputed. He was given permission by Lieutenant Graham, who is superior to Sergeant Johnson, to go through the pill line, whether or not it was the right plaza gate or not, because if he didn't have his medicine three times a day, he was going to lapse into this condition. Well, Your Honor, the lieutenant before him told him to leave the pill line. The lieutenant before him? I apologize. Sergeant Johnson. He's Lieutenant Johnson now. He was Sergeant Johnson then. Sergeant Johnson, the officer before him, told him to leave the pill line, told him repeatedly to leave the pill line. What did he tell him after he got the call from Lieutenant Graham? Well, he denies he got the call from Lieutenant Graham. Lieutenant Graham denies giving the call. But Sergeant Johnson is there. He sees the scene. He sees 20 to 30 unrestrained inmates at the pill line. There's a policy not to allow inmates from the West Yard and the East Yard to combine in this pill line because of prior fights. The lieutenant tells him to go get in line. Sergeant tells him to get out of the line. What's he to do? He's supposed to violate an order no matter what. He's supposed to leave the line, Your Honor. Why? When a lieutenant says go get in line and the sergeant tells you to get out of the line, what's an inmate to do? Lieutenant, Your Honor. How does he judge, make a determination of what he's to do without getting in trouble? Your Honor, the lieutenant, Graham, was not there under any version of the facts. Sergeant Johnson was there. Sergeant Johnson ordered him. Go get in line. Your Honor, Sergeant Johnson told him to leave the line repeatedly. I know. So he's told two different things. Your Honor, an inmate listens to, takes the order from the correctional officer standing in front of him and supervising the situation. Is that Wilcoxon? No, sir. Correctional law? I don't recall ever seeing any instruction to inmates that you go by who told it to you last, who gave you the last order. Your Honor, that is in Lieutenant Graham's affidavit. That is in Major Dean's affidavit. That is in Margaret Bell's affidavit. Did you go by what is told to you by the person in front of you? In this context, by Sergeant Johnson. You never disobey a correctional officer's order. Okay. Go ahead. And the district court . . . Is that in the affidavit of the prisoner also? No, sir, Your Honor, but the prisoner . . . When we're looking at it in the light most favorable, wasn't his characterization that he had this directive to proceed? I don't recall him saying anything about someone could countermand that. Of course, in the military it doesn't work that way, and maybe I know a prisoner is not the same way. If a lieutenant tells you something, a sergeant, no matter what he tells you, you better do what that lieutenant tells you to. Your Honor, I believe a prison is different, and every situation in a prison is dangerous. There were 20 to 30 inmates standing in this pill line under everybody's accepted version of the facts. The problem with your argument, as I see it, is that this is a case up here on summary judgment. I do not think that the district court considered the evidence in the light most favorable to the plaintiff, and there's sufficient evidence in this record if the jury chose to believe that Mr. Tedder was incompliant when he was trying to get through the gate which Lieutenant Graham had told him he could go do. Now, you say Graham didn't say he did that, but at Joint Appendix 73 in Mr. Tedder's affidavit, he says that Lieutenant Graham called on the radio and said, quote, let Billy Tedder go through, and that the officer, Sergeant Johnson, refused to let him go through. Now, if the jury chose to believe that, considering the evidence in the light most favorable to the plaintiff, it was error for the district court to grant summary judgment. Your Honor, the grant of summary judgment is a holding that there's no reliable inference that Lieutenant Johnson, Sergeant Johnson at the time, used for his maliciousness. He's got two affidavits from other inmates that says he was not belligerent, he was not resisting, he was incapacitated, that he was trying to get back to the unit. He was trying to do what Sergeant Johnson told him to do. He was physically not able to do it. Your Honor, from inmate Tedder's own affidavit, he received a directive to leave the pill line. He said no. He received a second directive to leave the pill line. Again, he says no. If Lieutenant Graham had said you can go through the pill line, then he was authorized to say no. I'm waiting to get my medicine. Lieutenant Graham has told me I can come here and get my medicine, go through the pill line, and go to the unit. That's what he was trying to do. Your Honor, the record demonstrates that you don't disobey a correctional officer. What about disobeying Lieutenant Graham? As Judge Fractor said, if your theory is correct, he either could choose to disobey Lieutenant Graham or he could choose to obey Sergeant Johnson. Which one is he supposed to do? Lieutenant Graham wasn't there. It doesn't matter. Lieutenant Graham had done this on numerous occasions, radioing and saying let Mr. Tedder go through the pill line. Once he leaves the dining hall, sometimes he'd let him go earlier so he might get to the pill line before the others did. He had done this on at least ten occasions. What's different in this case? Well, Your Honor, in this case there were 20 to 30 unrestrained inmates, some from the West Yard, some from the East Yard. And there was a policy in place, again, undisputed policy in place, that those inmates cannot be joined because of recent altercation between them. In other words, the existence of potential inmate unrest. So Sergeant Johnson, being the officer there, ordered Lieutenant, I'm sorry, Inmate Tedder to leave the pill line, return to his unit. And I'd like to point out what Inmate Tedder's response was when he said he was sick. He didn't say I'm just sick, I can't make it. He said he tried to take control of the situation. He says I'm going to lean against this here wall until I can make it to the dorm. Do you have any case in which the mere statements of I'm going to lean on this wall until I can get back, or even a statement that says no, is sufficient to justify the use of pepper spray? Yes, sir. No more. Just verbal statements. No physical, in the light most favorable. All you have is a verbal statement. And what you are saying is that the use of pepper spray in that instance is justified. Yes, sir, Your Honor, because Lieutenant, I'm sorry, Inmate Tedder would not leave. What is the case? Well, Your Honor, Presley v. Gregory. Why wouldn't he leave? He says I'm going to lean here against this wall until I can make it to the dorm. In other words, he didn't want to leave. He says until he can make it to the dorm. Doesn't that seem to indicate until he physically can make it to the dorm? He's got this cane. I mean, you can plainly see this. He's not some strapping, strong guy. And yet the response is not only does Sargent continue to question him about it, but he uses that racial term against him, which, quite frankly, I find quite offensive. I mean, that is no better than if you'd use the N-word against someone who was African American. It's the same thing. I know about that. I asked that question, but I know that term. And he knew what it was, too, when he used it. And to use it under those circumstances and then to use pepper spray on it. To a man who's got a cane and says I'm just going to lean. He didn't say I'm going to hit you. He didn't say I'm going to fight you back or no, I want someone. He says I'm going to lean on this wall until I can get back. Now, how is that helping your case that he is presenting a threatening situation or he is doing something that would justify the use of pepper spray? And there are numerous cases that say the use of pepper spray can be excessive force, particularly when it's unnecessary. Your Honor, at no point anywhere in the record does inmate Tedder – You said it wasn't in the record. It was in the record. I'm sorry. At no point anywhere in the record where inmate Tedder stated he tried to comply with the order. His response was I'm going to stay here by this wall. He tried to maintain control. What was the rest of it? I'm going to stay on this wall until I can make it to the dorm. Isn't that an indication that I'm trying to get there? Your Honor, it's an indication. He didn't say I'm going to lean on this wall and I'm not going to the dorm. He says until I can make it to the dorm. Your Honor, this has to be looked at in the context of the threat reasonably perceived by Lieutenant Johnson under the facts I agree most favorable to the plaintiff. But nobody disputes this is after – What's the threat to Sergeant Johnson? I mean, he's the one with all of the weapons and standing in front of him. What is the threat? And all he's doing is saying I'm going to lean on this wall. How is he going to threaten him by – is he going to push the wall down on him? I mean, what's going to happen? Your Honor, there's three correctional officers, 30 inmates. Inmates now that have – from the East Yard and West Yard where there have been altercations in the past. And just because an inmate tells you he's sick, a correctional officer does not assume that the threat – there's no longer a threat. Let me ask you that question. I realize you can't just – you just can't verify everything that the inmate says. But you've got one here with a cane. He apparently appears from his affidavit to be sickly. And he says he has this information from Lieutenant. Does he have a radio or does he have some means to communicate to verify that? Well, Your Honor, I think what the court is doing there is second-guessing Sergeant Johnson. I'm only dealing with the fact he's got time to call him names. He's got time to do all these other stuff to him. How long does it take to just pick this radio up and say I've got this inmate here who says he's supposed to be here, Lieutenant? Is that correct? Well, Your Honor, this was after inmate Tedder repeatedly refused to obey his order. And I do want to point out – Well, that would prompt you to ask. Well, Your Honor, the first time that Lieutenant Sergeant Johnson directed inmate Tedder to leave, inmate Tedder didn't respond to say, oh, I'm too sick. I need to get my medicine immediately. He said no. Lieutenant Graham said I could come through. He said what? He said no, Lieutenant Graham said I could come through. A second time, no, Lieutenant Graham said I could come through. Not until the third time when it was apparent to inmate Tedder that Sergeant Johnson was going to follow through. He didn't just say no. He actually told you the reason. He says the lieutenant says I can come through. So he was on notice that somebody, at least, that that was his position, whether it's true or not is subject to verification. My question is why not take that little radio? He did have a radio on him, didn't he? Your Honor, the record doesn't reflect one way or the other. Well, so there's no way for the prison guards to communicate? Can't we – I don't know of a prison in which guards don't communicate pretty rapidly. Your Honor, also – I think we can accept that fact. But regardless of whether it had – he didn't even try to verify it. Your Honor, he had a dangerous situation, and he had to clear inmate Tedder from this line. Let me ask you this. Suppose, for the sake of the argument, that Mr. Tedder was incapable of going any further. I mean, suppose that he had literally collapsed and then got sprayed. What could he have done if he was incapacitated to where he couldn't move? And he said, Joint Appendix 88, that he was moving slowly and appeared sickly. Tedder told Johnson, Graham said, I could go through the gate. I can't make it back to the dorm. I'm too tired and too weak to make it to the dorm. I'm going to lean against this wall until I can make it to the dorm. Now, is that noncompliant? Yes, sir. And any correctional officer would tell you as soon as you assume an inmate is telling the truth. Make my hypothetical. Suppose he was totally incapacitated. Would that make him noncompliant? If he was totally incapacitated? Yes. He couldn't move. Your Honor, if he was laying on the ground unconscious, I agree with you that Sergeant Johnson could not pepper spray him. But that's not the fact here. The fact here was inmate Tedder was responding. Inmate Tedder did not tell Sergeant Johnson until the third time he disobeyed his order that he was not going to bat the unit because he was too sick. Now, just because an inmate tells you something does not mean the threat is no longer there. You still had the unrestrained inmates. You still had segregated inmates from the East Yard and West Yard present. This had created a scene. Inmates were sitting around watching. This is a dangerous place. Sergeant Johnson had to enforce his order. And then you look at the amount of force he used. Pepper spray. Now, this court in Williams v. Benjamin has approved the use of chemical spray against a prisoner inside a cell. And the question is, did you do it to enforce your order or did you do it for malice or sadistic purpose? Is there a reliable inference that you did so? I'm sorry, did he do it for what? With malice and for a sadistic purpose to cause harm or did you do it to enforce your lawful orders? Is there a reliable inference that you did it with malice? I was going, if this man was in the condition that he says he was in, how is spraying him with pepper spray going to make him do anything differently? Your Honor, he... Answer my question. If he was in the condition that he said he was in, how is spraying him with pepper spray going to make him leave the area and go to the dorm? Well, Your Honor, the condition he said he was in, he was standing there. And Sergeant Johnson had to get control of him, so he had to use chemical munitions, and that controlled the situation. And then he was able to handcuff him and escort him out of there. You're making the same mistake the district judge made. You're not considering the evidence in the light most favorable to the plaintiff. I'm not saying the jury would have to believe it, but this is up here on summary judgment. Your Honor, what the district court did was take the undisputed facts and boil them into these five factors. What are the undisputed facts that you're relying on? Yes, sir, Your Honor. Repeated refusal to obey directives. Minimal amount of force used. This thing had happened with Sergeant Johnson ten times, according to the record, where he'd been told by Lieutenant Graham that Tedder's going to leave the mess hall early to get to the gate regardless of which gate is coming on. Let him go through without incident. Now, I don't know whether Sergeant Johnson was on the gate all those times or not, but it was known that that had happened at least ten times without any incident. Noticely absent from that description are any other circumstances in those other alleged ten times where inmates from the East Yard and West Yard were present. Was this at lunchtime? Was it at dinnertime? How many inmates were present? There's no way to compare those other ways to this circumstance. And that's what the district court, I believe, seized on. So this isn't about Tedder. It's about the other inmates. Well, yes, sir. No, it's about the circumstance, Your Honor. It is about the situation. Was there a threat reasonably perceived? What were the other inmates doing? Were they threatening him? Yes, sir. According to their own affidavits, the black inmates were rising up against inmate Tedder and the white inmates were sitting there conversing, saying this is wrong. That is a recipe for disaster in a prison. That is a situation that must be resolved quickly. You spray Tedder, who's not doing anything but leaning against a wall, saying I'm going to do it until I get back, but you don't do anything to the others. Your Honor, the record, well, nobody else was disobeying orders. And the record demonstrates Tedder wasn't leaning against a wall when he was sprayed. It's a passive disobedience. It's a disobedience where you say no and I'm leaning against a wall. That's a different type. What you're using here is pepper spray. And the cases are pretty clear. I mean, even our case of Taylor v. Lane, the eco case, and other cases in which it was used, if it's unnecessary for us. And when we focus on the evidence in a light most favorable, what we have is a man with a cane who leans up against the wall and says I'm going to lean on this wall until I can get back. And he gets sprayed for it. Even if he said no, I won't go back because Lieutenant told me I can go through. Each time he's given a reason. He didn't just say no, I'm disobeying you. He's telling him there's someone over you who's given me authority to go through here. And he's done it many times. And I don't know what a, even under the circumstances of a prison, an inmate does what he's supposed to do and what he's told to do, and he's done it many times. Not the first time he's coming through this gate. He's done it many times. And I don't know if it's ever worked before. He may have come through and the Lieutenant told him, and God might have just let him through. But this one chooses to call him racial names. And by the way, that can't help with the other inmates. Didn't you not tell me this is a confrontation between black inmates and white inmates? And here this guard uses a racial word that's very offensive in this crowd? How is that helping the situation? Your Honor, the existence. It's horrible, isn't it? I mean, think about it. I mean, you've got a guard standing at the gate. And he is preventing a man who obviously is sick. The inmates probably know this. Maybe it doesn't have to show it. But because he's been in there for a while, they know what he's doing. They know this man. And they know his situation. He's got a cane, and he's trying to get through. And you've got this guard who has all the authority, and you've got a racial situation that you just described. He uses a very inflammatory racial term against him. And then as the man is leaning against the wall and says, I want to get back, sprays him. Your Honor, the inmate, Ted, wasn't leaning against the wall when he was sprayed. Passive resistance doesn't work in a prison. May I finish? Passive. He wasn't Gandhi. Passive resistance does not work in a prison. You do what you're told. And Lieutenant Johnson is charged with maintaining order. And he has to clear the situation. And in Williams v. Benjamin. He does it by using a racial epithet in front of his. Was it in front of the group where the rest of them could hear? Allegedly. They don't say the rest of them could hear, Your Honor. In South Carolina, that does not, or anywhere else that I can think of in this country, that does not help a racial situation. And, Your Honor, but. For someone in a position of authority to use that, that does not help, does it? Well, Your Honor, the use of a minimal amount of force, which 14 grams of these chemical munitions has been found in the district of Cyclone to be a small amount of chemical munitions. This court approved it in Williams v. Benjamin. A limited application of mace is actually more humane. How many times did he spray Mr. Tedder in this case? One quick burst, Your Honor. I thought the record indicated he sprayed him twice. One quick burst, Your Honor. On my time, other than Sergeant Johnson, not Lieutenant Johnson, other than Sergeant Johnson's statements and so forth, what else is there in this record that supports his position? Your Honor, the affidavit of Inmate Tedder where he admits he repeatedly refused to obey Sergeant Johnson's orders. No, he didn't willingly refuse to obey it. You're mischaracterizing his affidavit. Your Honor, I don't mean to, Your Honor. He says he was told to leave the pill line, and his response was no. Well, no, Lieutenant told me I could come through. Then a second time, no, Lieutenant Graham told me I could come through. He did say that, but, again, you have a correctional officer telling you. There's no difference in saying no. No seems to indicate no because I don't want to. It's no because I have permission from a higher authority to come through. And, by the way, nearly everybody in there probably knows he's done it many, many times. Your Honor, it's not different because Sergeant Johnson gave him a very clear and direct order multiple times, and Inmate Tedder refused to obey it. And also— Was he flirting with the other officers, the female officers, while he was doing this? Your Honor— I mean, that's in the affidavit. We take it in light and most favorable. Fine. I understand that, Your Honor. But at what point do you give an inmate permission to disobey a correctional officer's order? And that's the crux of their case. I had permission, I had authority to disobey this correctional officer's order. The crux of the case is whether excessive force was used under these circumstances or the circumstance at hand. And the circumstance at hand is a nonthreatening inmate who says, I want to lean against this wall until I can get back. And he still responds by using racial epithets and, at the same time, spraying him in the midst of what you say is a racial tension situation. Because of the racial tension situation, he helps it by spraying him and using a racial epithet. A minimal amount of spray, Your Honor, and a minimal amount of spray demonstrates a measured and tempered response, not a wild, angry response. And that's what I'm citing to Williams v. Benjamin. When they gassed inmates confined in their cell in the Fourth Circuit in that case. That would be good evidence at trial. Your Honor, it is not summary judgment. You go back and you might persuade the jury this was minimum under the circumstances. But if this thing goes to trial, I don't know how it's going to turn out. But that fact is not disputed, Your Honor. It's going to turn you away. But that fact is not disputed, Your Honor. Which fact? The fact that the minimum amount of gas was used. But any amount of gas, if used unnecessarily, doesn't meet the standard. But, Your Honor, the— If used unnecessarily. Your Honor, using force to enforce your orders and control an uncooperative inmate is approved and authorized. Yes, and that would be, in fact, interpreted in a light most favorable to you. Your Honor, there's no— It's not the facts interpreted in a light most favorable to the inmate, which is the standard for the summary judgment. All that happens here is a trial. It doesn't mean you lose. But it just means you don't get the benefit of it because the affidavit is established in a light most favorable that doesn't present it a case that you win. He does lose his qualified immunity defense. And, again, there's no dispute that he repeatedly refused to obey directives. Let me ask you this about whether or not he had exhausted his administrative remedies. The record reflects that he said that the head grievance officer at the prison told him that, quote, his grievance regarding the pepper spray incident was done. Now, if there's anything in the record to refute that, that's one thing. But if not, then the district court did an error in holding that that created a genuine issue of material fact as to whether he had exhausted his administrative remedies. And that in itself would preclude the granting of summary judgment. Your Honor, the reason I disagree with that is there is documented evidence in the record that he was directed to file after the resolution of his disciplinary charge. It's his responsibility to exhaust administrative remedies. He can't rely on his inmate attorney. I understand all of that. But is he wrong in stating in his affidavit that the head grievance officer said that the grievance with respect to the pepper spray incident was done? Well, my response is it doesn't matter what a grievance coordinator tells you. You still have to go and file the grievance. Say that again. Your Honor, he was... It doesn't matter what he says. The grievance officer told him that the grievance had been completed. You say that makes no difference? Is that what you're telling me? Yes, sir. He has to file the grievance. Well, suppose a grievance officer says you've done that. It's done. I don't know what his done means. But it certainly creates a genuine issue of material fact, which the jury would be entitled to consider. Not if he didn't file the grievance, Your Honor. He didn't file the grievance. Who's in a better position to know whether he filed the grievance? Not him or the grievance officer? Your Honor, he admits he didn't file the grievance. Well, I don't know why the grievance... But that's in the record nevertheless. Your Honor, much like the outside world, just because you get bad advice doesn't mean you're excused from following the procedures. Thank you. Thank you, Mr. Wilcox. Thank you, Your Honor. We've got some time remaining. My opponent put a fair amount of emphasis on a policy that supposedly existed of separating inmates from the East and West Yards and not letting them be in the pill line at the same time. I just want to point out that the record shows that inmates from both East and West Yards were already in the pill line before Mr. Tedder got there, page 88 of the appendix. And so whatever purpose Sergeant Johnson had in removing Mr. Tedder from the pill line, it could not have been to separate inmates from the East and West Line when he just singled out Mr. Tedder. And moreover, the record shows, page 89 of the appendix, that the supposed policy of keeping these inmates from the East and West Yards apart was in practice rarely enforced. Mr. Tedder had been going to the pill line daily at lunch for months with Lieutenant Graham's permission, regardless of whether it was inmates from the East or West Yard in the line at the time. Let me ask you this. Mr. Wilcox correctly points out that in the affidavits of the correctional officers, they state that an inmate has to obey the order of an officer, even if he believes he's different or countermands a prior order. Is there any evidence from that point that contradicts, from you or your client who contradict that particular aspect of the case? No. There's nothing in the record to, and I would not contradict, the assertion that an inmate has to obey the order of the officer that's standing in front of him and telling him to do something. What Sergeant Johnson ordered Mr. Tedder to do was first not to go through the gate, and it is undisputed that he obeyed that order, and he never went through the gate. Even Sergeant Johnson's affidavit does not claim that Mr. Tedder went through the gate. So Mr. Tedder, while obeying the order not to go through the gate, made this brief attempt to convince Sergeant Johnson to change his mind by pointing out to him, truthfully, politely, and briefly, that Lieutenant Graham had said that he had permission to go through the gate, and indeed Lieutenant Graham said the same on the radio during this conversation. And it's not really correct, as my opponent suggested, that Mr. Tedder was ordered three times to go back to his unit, and only the third time did he say, I can't do that because I'm sick. The defendant ordered him not to go through the gate, and he didn't go through the gate, and he repeated that order a couple times. And then the defendant, for the first time, ordered him to go back to his unit. And at that point, Mr. Tedder responded by saying, I can't make it to the dorm. I'm too sick and weak. I'm going to lean on this wall. And you all have discussed that conversation extensively already, of course. I'd also point out that nothing anywhere in the record, nothing in anybody's affidavit, says that there was any actual disorder or conflict or threat from any of the other inmates in the vicinity. One of the affidavits mentions that some of the inmates watching the situation were laughing at Mr. Tedder, were finding Sergeant Johnson's behavior entertaining. And a couple of the inmates quietly spoke amongst themselves and disapproved of what was going on, and one of them asked another guard to please intervene, which the other guard declined to do. So that's the totality of the evidence regarding what the other inmates were doing on the scene, and there's nothing in there that suggests there was any kind of actual threat or disorder from any of the inmates. The record does reflect that Sergeant Johnson had a radio, because the record says that Lieutenant Graham called him on the radio. So if the court doesn't have any questions for me at this point, I'll save you the rest of my time. Thank you for your attention. Let's leave it until you come back, I guess. I mean, save you the time. Okay, save us the time, I guess. All right, we'll come down and recounsel and then go into the next case.
judges: William B. Traxler, Jr., James A. Wynn, Jr., Clyde H. Hamilton